MITCHELL KIES - September 13, 2024

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CLEBURNE TRAINING & FITNESS, INC. and NORTH NOLAN ROAD HOLDINGS, INC. D/b/a REAL PERFORMANCE, Plaintiffs, | ) ) ) ) ) |
| V. | ) CIVIL ACTION NO. ) 3:24-CV-00410-B |
| CHURCH MUTUAL INSURANCE COMPANY, Defendant. | ) ) ) ) |

ZOOM ==ORAL DEPOSITION== OF

==MITCHELL KIES==

VOLUME 1

ZOOM ORAL DEPOSITION OF MITCHELL KIES, a witness produced at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 13th day of September, 2024, 9:31 a.m. to 11:54 a.m., before Mary LaBounty, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, remotely by Zoom, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record.

AMARILLO COURT REPORTING
806-374-4091

**EXHIBIT 1**

MITCHELL KIES - September 13, 2024

```
 1        A.    Presumably, yes.
 2        Q.    And it shows that this occurred on June 20th,
 3   2023.  Do you see that?
 4        A.    I do.
 5        Q.    The -- is that consistent with your
 6   recollection of when this claim was first transferred to
 7   you for adjustment?
 8        A.    I don't recall, but that looks like a copy of
 9   the claim file.  I have no reason to dispute it.
10        Q.    The -- scrolling further down I'm now showing
11   you page 251.  Do you see that?
12        A.    I do.
13        Q.    And I will represent to you that this was an
14   earlier claims note, and it's several pages long.  So, I
15   apologize as I scroll down.  We're now looking at page
16   253.  Do you see there's a claims note from Jesse Barnum
17   dated May 9th, 2023?
18        A.    I do.
19        Q.    Now I will scroll back up so you can see.  The
20   start of this claims note says "coverage update."  Do
21   you see that?
22        A.    I do.
23        Q.    And it states, "Completed call with Mr. Mark
24   Simmerman.  Explained IA findings" -- I'll represent to
25   you that means independent adjuster findings -- "for
```

**MITCHELL KIES - September 13, 2024**

```
 1  dented roof materials."  Do you see that?
 2       A.   I do.
 3       Q.   It says, "In addition we reviewed
 4  CP 1036 10/12 roof surface endorsement."  Do you see
 5  that?
 6       A.   I do.
 7       Q.   It says, "We will generate partial denial to
 8  insured contact at address below," right?
 9       A.   It does.
10       Q.   Okay.  "Reviewed forms and policy language in
11  detail with insured today."  Do you see that?
12       A.   I do.
13       Q.   Okay.  So, I asked you a minute ago if at the
14  time that you took over the claim you understood that
15  Church Mutual had already made a claims decision with
16  regard to the applicability of the limitation on
17  coverage for roof surfacing.
18       A.   Okay.
19       Q.   And do you now understand based upon these
20  claims notes that Mr. Barnum had represented to the
21  insured that they were going to make a partial denial to
22  the insured based upon the CP 1036 10/12 roof surface
23  endorsement?
24            MS. FIGARO:  Objection, form.
25       A.   (By the witness)  It appears --
```

MITCHELL KIES - September 13, 2024

```
 1                THE WITNESS:  Can I answer?
 2                MS. FIGARO:  Yes.
 3        A.   (By the witness)  It appears that's what
 4   they've got in the file.  Yes.
 5        Q.   (By Mr. Doyle)  Okay.  Was that your
 6   understanding of what had happened at the time that you
 7   took over the claim?
 8        A.   Number one, I don't -- I don't know what I
 9   remember on that date.  I don't recall specifically.
10   However, it wouldn't surprise me if there was a note
11   like that in the claim file, but there wasn't a position
12   letter actually sent.
13        Q.   Okay.  Let's flip over to 756 real quick, and
14   we'll scroll through so you can see this is a complete
15   copy of the letter that continues all the way down to
16   page 761.  Do you see that?
17        A.   I do.
18        Q.   And this is a letter from you dated June 30th,
19   2023.  Do you see that?
20        A.   I do.
21        Q.   In the letter going back up to the top this
22   was -- is it a correct statement that this was the
23   first -- the first written communication that you had
24   with the insured?
25        A.   I don't know about that.
```

**MITCHELL KIES - September 13, 2024**

```
 1  And they look at damages very specifically that may not
 2  align with what the insurance policy states.
 3       Q.   Is your job to determine coverage based upon
 4  what the engineer thinks is cosmetic damage or what the
 5  policy says is cosmetic damage?
 6       A.   Policy.
 7       Q.   You would agree with me that the terms the
 8  engineer used are not in the relevant endorsement in the
 9  policy, correct?
10       A.   Correct.
11       Q.   After you received this engineering report did
12  you go back to talk to the engineer about the disparate
13  definitions she used in her report and how that would
14  apply to coverage under the policy?
15       A.   No, not that I recall.
16       Q.   She specifically states that one of the ways
17  that you can evaluate whether or not hail has damaged
18  the roof is abrasion of the protective coating.  Do you
19  see that?
20       A.   I do.
21       Q.   Prior to forming a coverage position in this
22  case did you ask that any of the hail indentations that
23  you observed be tested for purposes of determining
24  whether or not there's an abrasion of the protective
25  coating?
```

MITCHELL KIES - September 13, 2024

```
 1      A.   No, not that I recall.
 2      Q.   Are you aware that metallurgist can actually
 3 test whether or not the protective coatings have been
 4 damaged?
 5           MS. FIGARO:  Object to form.
 6      A.   (By the witness)  Yes.
 7      Q.   (By Mr. Doyle)  Have you seen in other cases
 8 where a metallurgist has actually performed that test?
 9      A.   I am aware of it.
10      Q.   Are you aware that in this case we actually
11 hired a metallurgist who concluded that the protective
12 coatings had been damaged?
13      A.   No.
14      Q.   Did you have any discussion with your engineer
15 about performing any necessary testing as to whether or
16 not the protective coatings had been damaged?
17      A.   Not my engineer, sir.
18      Q.   Did you have any conversation with anyone at
19 Church Mutual about whether or not that was necessary
20 testing prior to forming a coverage opinion in this
21 case?
22      A.   You asked your question a moment ago saying
23 "your engineer."  I want to make sure that we're
24 addressing that.  What I'm saying is, it's not my
25 engineer.  I don't own her.  She doesn't work
```

MITCHELL KIES - September 13, 2024

```
1              MR. DOYLE:  Sure.  This is on page 777 of
2   the documents produced by Church Mutual with regard to
3   this claim.  Okay?
4              MS. FIGARO:  Thank you.  Thank you.
5        Q.    (By Mr. Doyle)  You see where it says,
6   "dents" -- "hail damage to metal roofs can present as,"
7   and then one of the things that's identified is "dents
8   on seams causing separation."  Do you see that?
9        A.    I do.
10       Q.    Okay.  In your review of the file did you
11  actually determine that there was at least one dent on
12  the property caused by hail that had caused a separation
13  of a seam?
14       A.    Yes.
15       Q.    And, so, in your opinion that was functional
16  damage that was covered under the policy; is that
17  correct?
18       A.    It is.
19       Q.    Did you make the determination that that
20  damage occurred on the date of loss, March 16th, 2023?
21       A.    Based upon the report, yes.
22       Q.    Okay.  So, to be clear your determination on
23  behalf of Church Mutual is there was at least one
24  indication of functional damage to the roofing system
25  caused by hail on the date of loss, correct?
```

```
 1        A.    That's fair.
 2        Q.    After you reviewed the engineering opinion or
 3   engineering report from FCGA dated July 13th, 2023, did
 4   you ask any other person to evaluate the report?
 5        A.    It was shared with the building consultant to
 6   draft a repair estimate, so, I mean, I suppose in a
 7   sense they evaluated it.
 8        Q.    Was the purpose for which you asked the
 9   building consultant to review the report to put together
10   an estimate for the damages that you believed were
11   covered under the policy that were identified in the
12   report?
13        A.    Yes.
14        Q.    You were not asking the building consultant to
15   review the report for voracity or accuracy, correct?
16        A.    Correct.
17        Q.    You were not asking the building consultant to
18   review the report to determine whether or not the
19   engineer used the same definition for cosmetic or
20   functional damage that was included in the
21   CP 1036 10/12, correct?
22        A.    Correct.
23        Q.    Okay.  On August 31st, 2023, you sent a
24   coverage letter to the insured, correct?
25        A.    That's what it's showing, yes.
```

MITCHELL KIES - September 13, 2024

```
 1  but, yes.
 2       Q.   Okay.  Do you see -- we're looking at page
 3  237.  Do you see where it says "engineering report from
 4  PA"?
 5       A.   Yes, sir.
 6       Q.   And it says, "Received engineering report from
 7  PA which stipulates functional damage to the metal roof
 8  and interior leaking due to hail event in 2023."  Do you
 9  see that?
10       A.   I do.
11       Q.   And is that a statement that you included in
12  the claims notes?
13       A.   Yes.
14       Q.   Did you have any conversation with or
15  correspondence with the engineer that wrote the
16  engineering report on behalf of the insured or the
17  PA prior to August 31st, 2023?
18       A.   Not that I remember.
19       Q.   Is it a true statement that you received that
20  report on August 22nd, 2023?
21       A.   I don't know about that.
22       Q.   If it -- if your claims notes say that's when
23  you received it, is there -- do you have any reason to
24  dispute that?
25       A.   That document shows the date that I entered
```

MITCHELL KIES - September 13, 2024

```
1   that note.  If somebody sent me something on a Friday
2   night and I didn't put it into a claim file until Monday
3   morning or Monday afternoon, they would differ.
4       Q.    I'm not trying to trick you on when you
5   received it.  I just want to make clear that this was --
6   this would have been -- at the time you wrote this
7   claims note you would have had this in your possession,
8   right?
9       A.    Correct.
10      Q.    Okay.  And this was at least a week before you
11  entered your claims decision, correct?
12      A.    According to the documents, yes.
13      Q.    You also had some communications from the
14  insured's roofer.  Are you aware of that?
15      A.    I believe communicated with Mr. Mizell.
16      Q.    And I'm going to show you what's on page 733.
17  This appears to be an e-mail from you to Mr. Mizell
18  dated June 23rd, 2023.  Do you see that?
19      A.    I do.
20      Q.    And Mr. Mizell told you, "when we spoke
21  earlier" -- or this is your account of what Mr. Mizell
22  told you, correct?
23      A.    I don't -- I don't think it's my account of
24  what Mr. Mizell told me.  It's my e-mail to him.
25      Q.    Right.  And you are -- you are representing
```